UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

WILLIAM R. LACEY,                    )
                                     )
              Plaintiff,             )
                                     )
v.                                   )        No.:  **3:10-CV-39**
                                     )              (VARLAN/SHIRLEY)
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
              Defendant.             )

## MEMORANDUM OPINION

This case is before the Court for disposition of plaintiff's Motion for Judgment on the

Record [Doc. 9] and defendant's Motion for Summary Judgment [Doc. 11].  Plaintiff,

William R. Lacey, seeks judicial review of the decision by the Administrative Law Judge (the

"ALJ") to deny him benefits, which was the final decision of defendant Michael J. Astrue,

Commissioner of Social Security ("the Commissioner").

On November 25, 2003, plaintiff filed an application for Disability Insurance Benefits

("DIB"), alleging a disability onset date of October 15, 2003 [Tr., p. 102].  After his

application was denied initially, upon reconsideration, and after a hearing before the ALJ,

plaintiff requested Appeals Council review.  On June 5, 2007, the Appeals Council remanded

his case to the ALJ for further proceedings.

Pursuant to the remand order, plaintiff appeared before the ALJ on August 22, 2007

[Tr., pp. 478-90].  On October 23, 2007, the ALJ determined that plaintiff was not disabled

because he could perform a significant number of light jobs [*Id.*, pp. 13-24]. Plaintiff requested review of the ALJ's decision, but on December 10, 2009, the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner in this matter [*Id.*, pp. 5-7]. Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## I.    The ALJ's Findings

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since October 15, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: cervical degenerative disc disease with chronic pain, osteoarthritis, obesity, major depressive disorder, hypertension, pain disorder, and eating disorder, not otherwise specified (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to occasionally lift and or carry twenty pounds, frequently carry ten pounds, and sit, stand, and/or walk for about six hours of an eight hour workday. He is precluded from any work requiring climbing,      bending from the waist to the floor, repetitive twisting, bending his neck, and pushing or pulling with either upper or lower extremity. He can perform no more than occasional stooping, crouching, or crawling. He has limited, but satisfactory ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work

stresses, maintain attention and concentration, function independently, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and understand, remember and carry out simple instructions.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on February 26, 1960 and was 43 years old, which is defined as a "younger individual," on the alleged disability onset date (20 CFR 404.1564).

8.   The claimant has "limited" education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2003 through the date of this decision (20 CFR 404.1520(g)).

[Tr., pp. 15-24].

## II.   Disability Eligibility

An individual is eligible for supplemental security income ("SSI") if he has financial

need and he is aged, blind, or under a disability. *See* 42 U.S.C. § 1382(a). "Disability" is the

inability "[t]o engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). An individual shall be determined to be under a disability only if his physical and/or mental impairments are of such severity that he is not only unable to do his previous work, but also cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Disability is evaluated pursuant to a five-step analysis summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520).

Plaintiff bears the burden of proof at the first four steps. *Walters*, 127 F.3d at 529. The burden of proof shifts to the Commissioner at step five. *Id.* At the fifth step, the Commissioner must prove that there is work available in the national economy that the claimant could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

## III.    Standard of Review

In reviewing the Commissioner's determination of whether an individual is disabled, the Court is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence in the record to support the ALJ's findings. *Longworth v. Comm'r of Soc. Sec.*, 375 F.3d 387 (6th Cir. 2004). If the ALJ's findings are supported by substantial evidence based upon the record as a whole, they are conclusive and must be affirmed. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387 (6th Cir. 2004); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ or whether the reviewing judge may have decided the case differently. *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). On review, plaintiff bears the burden of proving his entitlement to benefits. *Boyes v. Sec'y*

*of Health & Human Serv.*, 46 F.3d 510, 512 (6th Cir. 1994) (citing *Halsey v. Richardson*, 441 F.2d 1230 (6th Cir. 1971)).

## IV.    Analysis

### A.    Failure to Identify Plaintiff's Cervical Myelopathy as a Severe Impairment

Plaintiff argues that the ALJ erred when he failed to identify his cervical myelopathy as a severe impairment at step 2 [Doc. 10, p. 12].  Specifically, plaintiff contends that the record supports the diagnosis of cervical myelopathy and that his symptoms are consistent with such a diagnosis [*Id.*, p. 11].  The Commissioner responds that the ALJ did not commit error because he identified one of plaintiff's severe impairments as "cervical and degenerative disc disease," rather than cervical myelopathy [Doc. 12, p. 12].

Plaintiff's argument is unpersuasive that the ALJ legally erred by failing to identify cervical myelopathy as a severe impairment.  It does appear, however, that the ALJ erred in the sense that he apparently overlooked the more serious condition—cervical myelopathy (dysfunction of the spinal cord)—in favor of one of its causes, "cervical degenerative disc disease with chronic pain."  This, however, does not constitute reversible error in the legal sense.  The U.S. Court of Appeals for the Sixth Circuit has recognized that the severity determination is a "de minimis hurdle in the disability determination process."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1998).  "According to the regulations, upon determining that a claimant has one severe impairment, the Secretary must continue with the remaining steps in his disability evaluation as outlined" by 20 C.F.R. § 404.150.  *Maziarz v. Sec'y of*

*Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). The *Maziarz* court found that an ALJ does not commit error when finding an impairment non-severe as long as the condition is considered in the determination of whether the claimant "retained sufficient residual functional capacity to allow him to perform substantial gainful activity." *Maziarz*, 837 F.2d at 244.

In this case, the ALJ found that plaintiff's severe impairments were "cervical and degenerative disc disease with chronic pain, osteoarthritis, obesity, major depressive disorder, hypertension, pain disorder, and eating disorder, not otherwise specified" [Tr., p. 15]. Since the ALJ passed step 2 by finding that plaintiff suffered from severe impairments, he continued with the sequential analysis required by the regulations [*Id.*, pp. 16-24]. Accordingly, the fact that some of plaintiff's impairments were not "deemed to be severe at step two is . . . legally irrelevant." *Anthony v. Astrue*, No. 07-3344, 2008 WL 508008, *5 (6th Cir. Feb. 22, 2008).

Plaintiff, however, also alleges that the ALJ failed to consider or discuss his cervical myelopathy in his determination of whether plaintiff had the residual functional capacity to perform gainful employment. The Commissioner contends that by referencing and relying on the medical records and reports of physicians who referenced cervical myelopathy, the ALJ is deemed to have considered the condition. For example, the ALJ noted the April 2004 report of David H. Hauge, M.D., which "represented [plaintiff's] absolute best functional capabilities as he does have persistent myelopathy on examination." [Tr., pp. 16, 301]. Moreover, the ALJ discussed the medical report and opinion of Jeffrey Uzzle, M.D., who

noted plaintiff's cervical myelopathy, both in his report and opinion assessing plaintiff's environmental limitations [*Id.*, p. 376]. Even though Dr. Uzzle opined that plaintiff suffered from cervical myelopathy, he found that plaintiff could perform a reduced range of medium work. The ALJ noted, however, that "Dr. Uzzle's opinion that the claimant can perform a reduced range of medium work appears to be an overestimate of the claimant's capabilities," arguably indicating that the ALJ considered plaintiff's cervical myelopathy when assessing his residual functional capacity [*Id.*, p. 22].

Plaintiff seems to urge the Court that if his cervical myelopathy had been found severe, he would have been found disabled [*See* Doc. 10, p.14 (asserting that "[t]he record is entirely consistent in the symptoms and diagnosis of cervical myelopathy, which is a separate impairment from cervical disc disease . . . caus[ing] all of the symptoms the ALJ claims are not backed up by the record")]. The Court notes, however, that a diagnosis alone does not establish the severity of an impairment. *See Higgins v. Bowen*, 880 F.2d 860, 863 (6 th Cir. 1988) (finding that "[t]he mere diagnosis of arthritis, of course, says nothing about the severity of the condition."). Moreover, decisions of disability are reserved for the Commissioner. 20 C.F.R. § 416.927(e).

The Court finds, however, that while the ALJ characterized plaintiff's severe impairment as "cervical and degenerative disc degeneration," mentioned cervical myelopathy once, and discussed and considered in his decision the reports and opinions of doctors who noted plaintiff's cervical myelopathy, there is little or no evidence that this condition or its effect on plaintiff was ever actually considered by the ALJ because he does not specifically

mention it or indicate that it was considered. It appears to the Court that the ALJ should have seriously considered the cervical myelopathy condition and its effect on plaintiff even though he failed to list it as a serious condition. At a minimum, the ALJ should have considered and/or explained Dr. Hauge's opinions on April 7, 2004, almost three years after plaintiff's cervical fusion surgery that was for "for pretty significant myelopathy" [Tr., p. 303], and which was at the site of his spinal cord myelopathy and myelomalcia, primarly at C6-7 [*Id.*, pp. 315, 318-20]. Almost three years later, Dr. Hauge opined that plaintiff still had "persistent cervical myelopathy status past cord compression at C5-6, C6-7" and that this explained, and was the continuing cause of, plaintiff's numbness and discomfort, which Dr. Hauge stated "probably emanate from persistent damage to the central sensory pathways within the spinal cord." [*Id.*, p. 300]. In his prior office visit note Dr. Hauge also discussed plaintiff's "persistent myelopathy due to his cord compression at C5-6 and C6-7, and has documented myelomalcia within the spinal cord." [*Id.*, p. 305].

The ALJ should also have explained the inconsistent evaluation by Richard Lisella, M.D., a State Agency physician who reviewed plaintiff's medical record in April 2004 [Tr., pp. 333-38]. While the ALJ referenced acceptance of Dr. Lisella's opinion and ultimately relied on his opinion in his conclusion that plaintiff was capable of performing light work, the ALJ failed to discuss or provide any reasoning for this determination [*Id.*, pp. 16, 20-21]. Dr. Lisella noted in his additional comments that Dr. Hauge had examined plaintiff on March 24, 2004, and that the MRI scan showed "no cervical spinal cord abnormality." Dr. Lisella also noted "medical evidence of record indicated the presence of myelopathy in 2001." [*Id.*,

pp. 337-38]. Apparently, Dr. Lisella had received Dr. Hauge's examination and report of April 7, 2004, or he would not have known about the MRI results. However, Dr. Lisella does not mention reviewing that report and only notes the prior March 24, 2004 report. Dr. Lisella's summary of Dr. Hauge's X-rays and MRI indicate and imply what are essentially completely normal findings. While Dr. Hauge did note that some positive improvements were seen, he also noted "residual osteophytic spur and some residual posterior longitudinal ligament." [*Id.*, p. 300]. Dr. Hauge also noted that plaintiff's "significant" myelomalagcia of the spinal cord at C6-7 had improved considerably "but" that there were "still some residual signs of it compared to [plaintiff's] preoperative imaging studies." [*Id.*]. It was based on these findings that Dr. Hauge opined that plaintiff had the "persistent" cervical myelopathy at C5-6 and C6-7 and that plaintiff's numbness and discomfort are likely explained by the "persistent" damage to the central sensory pathways within the spinal cord.

In light of the foregoing, the MRI would hardly be summarized as indicating "no cervical spinal cord abnormality." Rather, the MRI showed continuing, "residual," and "persistent" evidence of myelopathy/myelomalcia in the spinal cord resulting in "persistent" damage to the central pathways—factors which explained plaintiff's continuing numbness and discomfort. As such, this renders Dr. Lisella's terse summary seemingly incorrect and inconsistent with the medical evidence and of questionable reliability. When one adds the statement by Dr. Lisella that the "medical evidence of record indicates the presence of myelopathy in 2001," and omits Dr. Hauge's finding of its continuing "persistent" presence and effect in 2004—it appears Dr. Lisella's review was designed to, or at a minimum

10

erroneously implied, that it no longer existed and was not the cause of any current limitations—both findings contrary to plaintiff's treating neurosurgeon, Dr. Hauge. *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (finding that an ALJ may rely on a non-examining source opinion over a treating source opinion only when the non-examining source bases the assessment on a review of the complete medical record).

Even with the failure to consider these more significant findings, Dr. Lisella only found plaintiff "capable of a range of light exertion with occasional postural activities." [Tr., p. 16]. Inclusion of the more accurate and severe objective findings and limitations would surely have reduced plaintiff's range of work. At the very least, it was worthy of an explanation by the ALJ as opposed to mere unexplained acceptance. This is even more important as the ALJ had earlier erred in his first decision in which he had noted Dr. Hauge's report as indicating "persistent myelopathy due to cord compression at C5-6 and C6-7, with no vascular disease (myelomalcia) within the spinal cord." [*Id.*, p. 36]. However, as noted above, Dr. Hauge actually found that the "significant" myelomalcia had improved but that there was still in fact residual signs of it [*Id.*, p. 300], and the permanent damage it caused to plaintiff's central sensory pathways in the spinal cord accounted for plaintiff's continuing symptoms of numbness and discomfort. It appears the ALJ may have continued to labor under this mistaken finding in his omission of cervical myelopathy as a serious condition and in his failure to discuss its impact on plaintiff.

Finally, Dr. Uzzle acknowledged plaintiff's cervical myelopathy, and noted as late as June 2006 that plaintiff continued to have neurological findings on upper motor neuron sign

testing and neurological impairments resulting from his cervical myelopathy which he found unlikely to improve [Tr., pp. 371-72]. The ALJ omitted both of these statements from his lengthy analysis of Dr. Uzzle and failed to discuss, explain, or account for them.

Accordingly, the Court finds that the ALJ failed to note plaintiff's cervical myelopathy as a severe impairment and mentioned cervical myelopathy only once. Though the ALJ discussed and considered in his decision the reports and opinions of doctors who noted plaintiff's cervical myelopathy and myelomalacia, he failed to reference the portions of the medical evidence that indicated its continuing existence, permanent damage, and persistent residual effect on plaintiff. As such, there is simply little or no evidence that this condition or its effect on plaintiff was ever actually properly considered by the ALJ. On remand, the ALJ is directed to consider and explain plaintiff's condition of cervical myelopathy and myelomalacia, whether such constitutes a severe impairment at step two, and in any event, the functional impact of these conditions on plaintiff's ability to work.

**B.      The ALJ's Credibility Determination**

Plaintiff argues that the ALJ faled to properly evaluate his credibility [Doc. 10, p. 15]. Specifically, plaintiff argues that the ALJ erred when: (1) reporting that the treating and examining physicians failed to note any significant musculoskeletal, motor, or sensory abnormalities; (2) discussing plaintiff's daily activities; and (3) stating that the objective findings were minimal [*Id.*, pp. 15-19]. The Commissioner responds that the ALJ's adverse credibility finding is well-supported and that plaintiff's argument merely repeats his previous

argument that the ALJ erred when failing to find his cervical myelopathy constituted a severe impairment [Doc. 12, p. 13].

An ALJ's finding about the credibility of a claimant's allegation of disability is entitled to deference. *Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 531 (6th Cir. 1992) (citing *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)); *see also Rogers*, 486 F.3d at 249 ("while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence"). The Court does not make its own credibility determinations and is precluded from substituting its own credibility determination. *See Walters*, 127 F.3d at 528. "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005). An ALJ's credibility determination is "entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).

An ALJ's credibility determination, however, "must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave the to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2. In assessing a claimant's credibility, SSR 96-7p and the regulations provide various factors that an ALJ should consider: daily activities; the type, dosage, effectiveness and side effects of any medication taken to alleviate symptoms; treatment, other than medication, the claimant receives to relieve the pain; measures used by the claimant to relieve symptoms; and

any other factors concerning functional limitations due to symptoms. *See* SSR 96-7p; 20 C.F.R. § 416.929.

First, plaintiff finds error with the ALJ's statement that plaintiff's "clinical examinations revealed only subjective complaints of pain and none of his treating or examining physicians reported finding any significant musculoskeletal, motor, or sensory abnormalities" [Tr., p. 21] and that "objective findings are minimal" [*Id.*, p. 22]. The Court agrees.

In June 2003, Dr. Weems opined that "[t]he main findings are the increased reflexes in the lower extremities, bilateral Babinski of the feet, a left Hoffmann and right leg drift with some decrease in size of the anterior tibial muscle on the right." [Tr., p. 308]. Dr. Weems also found atrophy in the right leg [*Id.*, p. 307]. In addition, in March 2004, Dr. Hauge noted that plaintiff's gait was slow; he had a slight limp; a "mildly residual left Hoffman's sign;" "2 to 3 beats of colunus in the left foot;" and there was a "diffuse decrease in pinprick in all of the upper extremity groups below C4 down to C8." [*Id.*, pp. 303-04]. In April 2004, Dr. Hauge found that plaintiff's numbness and discomfort likely "emanate from persistent damage to the central sensory pathways within the spinal cord." [*Id.*, p. 300]. In July 2005, Dr. Flaming found continuing definite, ongoing Babinkski on the right side, questionable on the left side [*Id.*, p. 362]. Finally, in June 2006, Dr. Uzzle noted not only that plaintiff used a cane during ambulation and dragged his right leg, but that he still had persistent limping on the right; his gait pattern and ability to heel-toe walk were "poor;" he continued to have a "positive Hoffman bilaterally" and "positive Babinski bilaterally;" his

"sensory examination shows numbness in both hands and all the digits in a mutidermatomal and multinerve distribution;" he had hyperalgesia to light touch bilaterally, especially in the right foot; numbness by pinprick test in the left calf and left forearm; "positive neurological findings on upper motor neuron sign testing;" "multiple areas of numbness in 3 of 4 limbs;" "fatigue in his right upper extremities;" and arthritic problems in his hips and knees [*Id.*, pp. 370-71]. Either the ALJ overlooked these evaluations or discounted them entirely without explanation. In either event, these evaluations belie the ALJ's statements above because these objective findings are considerably more than "minimal" and plaintiff's complaints of pain were substantiated, and more than merely subjective, and his treating and examining physicians did report findings of significant musculoskeletal, motor and sensory abnormalities. Remand will allow the ALJ to consider such matters as the continuing neurological impairments from cervical myelopathy; repeated medical findings of limping, right leg drag and use of a cane; and the continuing positive Hoffman's and Babinski signs along with plaintiff's continuing objective findings of numbness in his hand and fingers and in three of four limbs, as well as the other referenced items. The ALJ should address the extent to which he accepts or rejects these findings with his explanation for either, and the extent to which these abnormalities are or are not consistent with Dr. Flaming's residual functional capacity opinion. He should also address their impact on plaintiff's credibility, and the extent to which they do or do not affect plaintiff's ability to be employed. While there is clearly evidence found in the record of musculoskeletal, sensory and motor abnormalities and deficiencies and significant objective findings contrary to the ALJ's

statements, this is not the only statement the ALJ made regarding plaintiff's credibility. The Court will discuss other factors the ALJ relied upon when assessing plaintiff's credibility below.

Plaintiff also argues that the ALJ misstated his activities of daily living when assessing his credibility. Plaintiff reported in April that he fixes meals for himself daily, mows the grass once a week, vacuums, does laundry, and goes to church regularly [Tr., p. 217-19]. In addition, in a report submitted by Jodi Castellani, P.h.D., plaintiff reported that he attends church on Wednesday nights and Sundays [*Id.*, p. 404]. Dr. Castellani indicated that plaintiff reported that he goes to "Ruby Tuesdays and Applebees's restaurants with his wife approximately one to two times per month and is able to order, pay, and be appropriate in that setting." [*Id.*]. Plaintiff also reported that he played games and paid family bills on the computer [*Id.*]. While the ALJ stated that plaintiff "performed car repairs," this activity appears to be something he previously performed as he indicated that he *used* to do this task, but that he now has to pay others to complete the repairs [*Id.*, p. 219]. As plaintiff noted to Dr. Castellani, he still attempts repair projects at home, but is usually unable to complete the projects [*Id.*, p. 404]. While plaintiff's ability to perform car repairs is more limited than recognized by the ALJ, the ALJ's discussion of plaintiff's daily activities as a whole is generally supported by the substantial evidence of the record and provides some support for the ALJ's credibility determination. Although the Court questions whether things like going to church, eating out twice a month, ability to use a computer, and feeding pets are so

vigorous as to be disproportionate to plaintiff's objective medical record or to translate into an ability to work, on remand, the credibility determination will again be up to the ALJ.

The ALJ also found plaintiff's testimony not credible, finding his "subjective complaints of disabling physical and mental limitations are disproportionate to the objective clinical and diagnostic medical evidence." This blanket statement without specific supporting documentation appears somewhat contrary to the objective medical evidence set forth in this opinion and in the record as a whole. This is important because if plaintiff was deemed credible regarding his complaints and limitations, he would likely be deemed disabled, particularly in light of the vocational expert's testimony. Further, plaintiff made these same or similar complaints of physical and mental limitations to his various treating and examining physicians, but the ALJ cites no examples of physician findings that support his claim that these complaints were exaggerated, disproportionate, or based on malingering.

To the contrary, most if not all of the various physicians either impliedly accepted plaintiff's complaints (by not noting any questions regarding them and then making medical findings that supported them) or specifically affirmed plaintiff's credibility regarding them. For example, James Hudson, M.D., the State Agency physician relied upon by the ALJ [Tr., p. 18, Ex. 17F, Tr. 393-400], addressed plaintiff's credibility regarding his subjective complaints of physical and mental limitations in the "Symptoms" section of his report, including opining whether "the severity and duration of the symptom, in your judgment, is disproportionate to the expected severity or expected duration on the basis of claimant's medically determinable impairments" and whether "the severity of the symptom(s) and its

alleged effect on function is consistent, in your judgment, with the total medical and nonmedical evidence including statements by the claimant and others, observations regarding activities of daily living. . ." [*Id.*, p. 398]. Dr. Hudson found plaintiff to be "totally credible per objective medical evidence." [*Id.*]. Although this is directly contrary to the ALJ's finding, he makes no mention of it, let alone explains it. Similarly, the consultative psychological evaluation report by Dr. Castellani in April 2007 [*Id.*, pp. 401-08], was relied upon by the ALJ [*Id.*, p. 18, Ex. 18F], who summarized the report's "Activities of Daily Living" section and plaintiff's description of the same, but omitted the part about plaintiff's description of "bad days" and "good days" and the claim that on bad days he cannot get out of bed due to pain, or if he gets up, he has to go back to bed and that this happens two to three times every week. Only on "good days" can he clean, load the dishwasher or run the vacuum, and this is only one to two times per week. Additionally, the ALJ omitted the "Current Signs and Symptoms" portion of Dr. Castellani's report which contains plaintiff's subjective complaints of disabling physical and mental conditions—the subject of the ALJ's adverse credibility finding. The ALJ also omitted the findings by Dr. Castellani that plaintiff's complaints were consistent with his demeanor, that plaintiff appeared in pain and had difficulty rising from his chair. More importantly, Dr. Castellani found that plaintiff "appeared to be a reliable historian and he did not appear to overstate his case" [*Id.*, p. 403] and "no malingering is suspected in this case" [*Id.*, pp. 406-07]. Again, this finding of plaintiff's credibility and reliability regarding his symptoms is both directly contrary to the ALJ's credibility assessment but is unmentioned and unexplained in the ALJ's decision.

Likewise, Andrew Jay Phay, Ph.D., a State Agency psychologist, relied upon by the ALJ [Tr., p. 18] and who was provided reports [Exs. 19F, 20F, 21F]; [*Id.*, pp. 409-30] and noted plaintiff's mental limitations in terms of activities of daily living, found plaintiff to have a mental impairment, and also noted plaintiff's "limitations related primarily to physical problems." He also found plaintiff's "allegations" credible [*Id.*, p. 425]. Finally, William Regan, M.D. [Ex. 8F, 9F] [*Id.*, pp. 345-60], a State Agency psychiatrist relied upon by the ALJ [*Id.*, p. 19], after reviewing plaintiff's records, also found plaintiff's allegations to be credible [*Id.*, p. 356].

It may be that the ALJ has some basis for discounting all or some of these medical findings and opinions that plaintiff was credible, with regard to the nature and extent of his subjective complaints, in reaching his conclusion that plaintiff was not credible. However, in light of the above noted volume of evidence, the ALJ's failure to note or explain them is at the very least questionable and his credibility determination does not appear to be supported by the substantial evidence in the record. On remand, the ALJ should address and explain these credibility findings by the physicians he relied upon, in light of his own credibility assessment.

### C.     The ALJ's Discussion of Treating Physician, Dr. Flaming

Plaintiff argues that the ALJ erred by failing to give controlling weight to the opinion of his treating physician, Dr. Flaming [Doc. 10, pp. 19-21]. Specifically, plaintiff argues that the ALJ erred by stating that Dr. Flaming relied heavily on plaintiff's subjective complaints of pain when the ALJ failed to clarify the information provided by Dr. Flaming [*Id.*, p. 21].

The Commissioner responds that the ALJ gave "good reasons" when rejecting Dr. Flaming's opinion, and that plaintiff failed to provide specific evidence after stating that the support for Dr. Flaming's opinion is "voluminous." [Doc. 12, p. 15].

When determining a claimant's Residual Functional Capacity ("RFC"), an ALJ is required to evaluate every medical opinion in the record, regardless of its source. 20 C.F.R. § 416.927(d). A "medical opinion" is defined as a statement from a physician, psychologist, or "other acceptable medical source" that reflects "judgments about the nature and severity of [a claimant's] impairment(s)." 20 C.F.R. § 416.927(a)(2). A medical source is considered a treating medical source if he has provided medical treatment or evaluation, and he has had an ongoing treatment relationship with the claimant "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)]." *Blakley*, 581 F.3d at 407 (quoting 20 C.F.R. § 404.1502).

An ALJ "must" give a medical opinion provided by a treating source controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and it is "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544; *see* 20 C.F.R. § 416.927(d)(2). If an ALJ decides not to give controlling weight to the medical opinion of a treating source, he is required to explain why in his narrative decision. 20 C.F.R. § 404.1527(d)(2); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) (stating that while an ALJ is not bound by the opinions of a claimant's treating physicians, he is required to set forth some basis for rejecting these opinions). The ALJ is also required to provide in his narrative "good reasons" justifying the weight that he

20

actually gave to a treating source's non-controlling opinion. 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 401 (remanding a claim to the Commissioner "because the ALJ failed to give good reasons for discounting the opinions of [the claimant]'s treating physicians"). In order to determine the proper weight to give to a treating source's opinion, the ALJ must conduct a six-factor analysis. *See* 20 C.F.R. § 416.927(d)(2). The ALJ must consider (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of and evidentiary basis for the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the source; and (6) anything else that tends to support or contradict the opinion. 20 C.F.R. § 416.927(d)(2)-(6).

In this case, Dr. Flaming was plaintiff's treating primary care physician. Dr. Flaming completed an RFC questionnaire regarding plaintiff's abilities in July 2007. Dr. Flaming identified plaintiff's diagnoses as cervical stenosis, hypertension, depression, and chronic back pain and rated his prognosis as fair [Tr., p. 432]. Dr. Flaming opined that plaintiff's impairments were severe enough to interfere with his attention and concentration [*Id.*, p. 433]. Dr. Flaming also opined that sitting/standing were each limited to less than two hours in an eight-hour work day and that plaintiff could occasionally lift up to twenty pounds [*Id.*, pp. 433-34]. In addition, Dr. Flaming reported that plaintiff's symptoms were likely to produce "good days" and "bad days," resulting in plaintiff missing work more than three times each month [*Id.*, p. 434].

The ALJ expressly considered Dr. Flaming's opinion. The ALJ stated as follows:

> Dr. Flaming's opinion is entirely inconsistent with the record as a whole and is not supported by his own treatment records. The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported . . . the State agency medical consultants are provided greater weight, as they are consistent with the claimant's daily activities, the treatment records, and objective findings.

[Tr., p. 21-22].

The Court finds that the ALJ provided his reasons for discounting the opinion of Dr. Flaming. First, the ALJ stated that Dr. Flaming's opinion was inconsistent with the entire record and not supported by his treatment records. *See* 20 C.F.R. § 416.927(d)(2), -(4). Second, the ALJ stated that there was an inadequate evidentiary basis for Dr. Flaming's opinion, as his opinion was based on plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1527(d)(3). Third, the ALJ stated the state agency medical consultants' opinion were more consistent with the record and supported by objective findings. *See* 20 C.F.R. § 404.1527(d)(3).

If the ALJ's finding was supported by substantial evidence, then it was a valid reason for discounting Dr. Flaming's opinion. Based on the previously noted medical evidence in the record, and the undersigned's review of the entire record, however, the Court is unable to state that the ALJ's finding was supported by substantial evidence for the following reasons.

The ALJ contends that Dr. Flaming's July 2007 opinion is *entirely* inconsistent with the record as a whole. However, as heretofore noted, the ALJ does not appear to have considered the record as a whole, particularly those portions of the medical record consistent with Dr. Flaming's opinion and plaintiff's complaints. For example, Dr. Flaming's "diagnosis" [Tr., p. 432] mirrors not only the medical findings of other doctors, but also the ALJ's own determination of plaintiff's severe impairments (*e.g.,* cervical stenosis, chronic neck pain, hypertension, and depression). Dr. Flaming's identification of "patient symptoms" likewise mirrors the physical and mental findings in the medical record [*Id.*]. In fact, the only difference between Dr. Flaming's report and the reports of others seems to be with Dr. Flaming's conclusions. It should be noted that Dr. Flaming was actually seeing and treating plaintiff on a regular basis and had seen him much more recently, at the time of the report, than the other doctors. Dr. Flaming did opine that plaintiff could sit and stand less than two hours per day [*Id.*, p. 433], but Dr. Misra opined that plaintiff's standing or walking was limited to at least two hours in an eight-hour day [*Id.*, p. 387]. Dr. Flaming opined plaintiff's symptoms interfered with his attention and concentration "often," and opined that plaintiff's limitations in his ability to deal with stress of working was "moderate" "to severe at times." [*Id.*, pp. 432-433]. However, Dr. Castellani also found plaintiff's ability to sustain concentration was moderately limited, with trouble focusing for long periods of time due to his unresolved pain and depression [*Id.*, p. 405]. He also found plaintiff might have difficulty working around others without being distracted and would have trouble being flexible in some work settings due to his uncontrollable depression and pain, and overall found him to

be "mild to moderately" limited based on his mood and pain disorder [*Id.*, pp. 405-6]. Dr. Phay found plaintiff to be functionally limited in these areas and noted the degree of limitation for difficulties in maintaining concentration as "moderate." [*Id.*, p. 423]. He also found plaintiff's ability to maintain attention and concentration for extended periods and perform work on schedule; ability to maintain regular attendance and complete a normal workday and workweek without interruptions from his psychological symptoms; and his ability to perform at a consistent pace without an unreasonable number and length of rest periods all to be "moderately limited." [*Id.*, pp. 423, 427]. John E. Porter, M.S., also found plaintiff's ability to sustain concentration "significantly limited" due to his depression, anxiety, and pain disorder [*Id.*, p. 343]. Likewise, Dr. Flaming's opinion that plaintiff would average more than three absences a month due to his medical condition or treatment comports with Dr. Regan's finding of one or two episodes of decompensation, each of extended duration [*Id.*, p. 354].

Based on these examples alone, it does *not* appear Dr. Flaming's opinions are "entirely inconsistent" with the record as a whole. To the contrary, given the medical findings, impairments, and limitations, Dr. Flaming's opinion is arguably quite consistent with the record and comports with many of the opinions of others.

The ALJ also discounted Dr. Flaming's opinion by stating Dr. Flaming did not do objective testing and "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and seemed to uncritically accept as true, most if not all of what the claimant reported." [Tr., pp. 21-22]. Dr. Flaming conducted sensory

(Babinski) tests [*Id.*, p. 362], a nerve conduction exam [*Id.*, p. 233]; took knee x-rays; and requested an MRI [*Id.*, p. 379]. Further, as specifically noted in his report, and as noted by the ALJ, only the lift and carry limitations on plaintiff's RFC questionnaire were based on plaintiff's symptoms [*Id.*, pp. 18-19, 435] and said lifting restrictions of twenty pounds occasionally was adopted by the ALJ in his RFC finding [*Id.*, p. 19].

Finally, in stating that the State Agency opinions are more consistent with the medical record than Dr. Flaming's opinion and in adopting the State Agency opinions over Dr. Flaming's opinion, the ALJ should, on remand, address the following: (1) What was Dr. Flaming treating plaintiff for and what "subjective symptoms and limitations" did he note that are not consistent with the other doctors' reports in the medical record; (2) In regard to the contention in the ALJ's decision that the fact that plaintiff had not had "physical therapy" or "steroid injections," and had not been "referred to a pain clinic," the ALJ should state what medical evidence in the record indicated the foregoing was medically reasonable and necessary and was treatment of the type "one would have expected for a totally disabled person" and would in fact have been the recommended treatment for plaintiff's diagnosed medical problems; (3) Why are medical providers (*e.g.* Drs. Uzzle and Hauge) and a Functional Capacity Evaluation in 2001, two years before the alleged onset date of disability, considered more reliable of plaintiff's current condition, abilities and limitations, than Dr. Flaming's evaluation in July 2007; (4) What, if any, consideration was given to the type, dosage, effectiveness, and side effects of any medication (other than the reference to Celexa in 2005) the claimant takes or has taken (including plaintiff's statements regarding their side

effects) to alleviate pain or symptoms, including depression/anxiety symptoms, (*e.g.,* Percocet, Elavil, Amitriptyline, Naprosyn, etc.) [Tr., p. 20]; (5) Why there is no comment or mention in the ALJ's decision of the positive straight leg raising tests by Dr. Misra [*Id.*, p. 386] and Dr. Hudson [*Id.*, p. 392] in support of plaintiff's back and leg complaints and continuing neurological involvement in both, and what effect, if any, do those test results have on plaintiff's credibility as to his symptoms and limitations and his ability to work; and (6) What consideration was given of the number of days, if any, plaintiff will likely miss from work per month and its effect, if any, on his employability and what consideration, if any, was given regarding his description of "good days" and "bad days" and their functional affect on plaintiff's ability to maintain employment.

### D.     The ALJ's Assessment of Plaintiff's Obesity

Plaintiff argues that the ALJ failed to assess the effect of his obesity on his musculoskeletal impairments as required by SSR 02-1p [Doc. 10, p. 22].  Specifically, plaintiff asserts that the ALJ's assessment of his obesity was inadequate because two consultative examinations referred to his obesity and its effect on his ability to walk, twist, turn, bend, and lift [Doc. 10, pp. 22-23].  The Commissioner contends that the ALJ adequately addressed plaintiff's obesity [Doc. 12 , p. 16].

Social Security Ruling 02-1p "remind[s] adjudicators to consider [the effect of obesity] when evaluating disability."  2000 WL 628049, at *1.  The ruling states:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.  Individuals with

26

> obesity may have problems with the ability to sustain a function over time . . . [O]ur RFC assessments must consider an individuals' maximum remaining ability to do sustained work activities in an ordinary setting ona [sic] regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Id.* at *6.

The Sixth Circuit has held that it is "a mischaracterization to suggest that Social Security Ruling 02-1p offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barhart*, 165 F. App'x 408, 412 (6th Cir. 2006). Further, the Sixth Circuit has noted that SSR 02-1p provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Bledsoe*, 165 F. App'x at 412.

In this case, the ALJ explicitly considered plaintiff's obesity. The ALJ determined that plaintiff's obesity constituted a severe impairment [Tr., p. 15]. When determining plaintiff's RFC, the ALJ stated the following regarding plaintiff's obesity:

> The claimant has also been diagnosed with obesity, with his height of 73 inches, weight of 338 pounds, and body mass index of 44.6, as indicated in the consultative examination in January 2007. The undersigned has considered the impact obesity has at steps two through five of the sequential evaluation, singly and in combination with his other impairments. Consideration included determination of the extent and severity of the claimant's impairment-related limitations, consistent with Social Security Ruling 02-1p.

[*Id.*, p. 22]. Based on the ALJ's statement, he considered plaintiff's obesity and acknowledged that plaintiff's obesity impacted his other impairments. Additionally, the ALJ

stated that he considered plaintiff's obesity in assessing his RFC and determining whether work existed that plaintiff could perform consistent with the RFC determination.

Moreover, while plaintiff asserts that the ALJ failed to discuss statements made regarding the impact of his obesity, the ALJ considered RFC evaluations from physicians who directly accounted for plaintiff's obesity. *See Coldiron v. Comm'r of Soc. Sec.*, No. 09-4071, 2010 WL 3199693, *7 (6th Cir. Aug. 12, 2010) (upholding ALJ's assessment of plaintiff's obesity when "the ALJ considered RFCs from physicians who explicitly accounted for [plaintiff's] obesity"). Dr. Uzzle commented that while plaintiff's obesity impacted plaintiff's hip range of motion, he was still able to lift up to fifty pounds occasionally and up to twenty-five pound freqently, and could stand/walk for approximately six hours in an eight hour day [Tr., pp. 370-73]. The ALJ explicitly discussed Dr. Uzzle's opinion, and limited plaintiff to a greater extent than Dr. Uzzle when finding that plaintiff was capable of light work. Dr. Misra also reported that while plaintiff was obese, he could perform the lifting requirements of light work. The ALJ reported that plaintiff's RFC is "largely supported by the functional assessment of Dr. Misra." [*Id.*, p. 18]. Therefore, by discussing these two physicians' opinions regarding plaintiff's RFC, the ALJ incorporated their consideration of the effect of plaintiff's obesity into his RFC determination. *See Bledsoe*, 165 F. App'x at 412 (finding that ALJ does not need to specifically mention plaintiff's obesity if he credits an expert's report that considers obesity).

The ALJ expressly considered plaintiff's obesity and the record does not indicate that plaintiff's obesity itself impairs him beyond the point of that recognized by the ALJ. Accordingly, the Court finds that the ALJ did not commit error in his analysis of plaintiff's obesity. However, in light of the previous remand [Tr., pp. 82-84], requiring the ALJ to consider the combined effect of plaintiff's obesity with other impairments and whether these other impairments might be greater than without obesity, the ALJ should specifically address this issue, and not just that he considered it, but his opinion based on that consideration.

## V.    Conclusion

For the foregoing reasons, plaintiff's Motion for Judgment on the Record [Doc. 9] will be **GRANTED**, to the extent this case is **REMANDED** to the Commissioner. The Commissioner's Motion for Summary Judgment [Doc. 11] will be **DENIED**. On remand, the ALJ is **DIRECTED** to consider the entire record and explain the following: (1) whether plaintiff's condition of cervical myelopathy and myelomalacia constitutes a severe impairment at step two, and in any event the functional impact of these on plaintiff's ability to work; (2) his own prior credibility finding in light of the herein referenced medical evidence and in light of other physicians of record opining that plaintiff's subjective complaints of pain were credible and, whether in light of the cited medical evidence, plaintiff's complaints were disproportionate to the objective medical evidence; (3) provide an explanation for the acceptance or rejection of the opinion of Dr. Flaming, plaintiff's treating physician, in light of this opinion being supported by plaintiff's medical record; (4) answers to the six questions in Section IV, Subpart C; (5) the combined effect of plaintiff's

obesity with other impairments and whether these other impairments might be greater than without obesity; (6) plaintiff's residual functional capacity in light of the review of the above matters and the record as a whole; and (7) whether plaintiff is able to do any work considering his residual functional capacity, education, and current work experience, *e.g.*, whether plaintiff is disabled or not disabled.

An appropriate order will be entered.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE